CONTINENTAL TRUST CO. v. TALLASSEE FALLS MFG. CO. et al.

(District Court, M. D. Alabama, N. D. March 25, 1915.)

No. 298.

1. CORPORATIONS ⊙══642—FOREIGN CORPORATIONS—CARRYING ON BUSINESS WITHIN STATE.

Code Ala. 1907, §§ 3642, 3643, which require foreign corporations "before engaging in or transacting any business in this state" to file an instrument with the Secretary of State designating a place of business in the state and an agent thereat, have no application to a mortgage executed in another state by one foreign corporation to another, although it covers real property in Alabama, nor do they apply to a conveyance by a domestic to a foreign corporation which is an executed transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2520–2527; Dec. Dig. ⊙══642.]

2. JUDGMENT ⊙══828—JUDGMENT AS BAR—SUIT BETWEEN DIFFERENT PARTIES.

A judgment of a state court dismissing a suit to quiet title on the ground that the plaintiff was out of possession and its remedy was at law is not a bar to a subsequent suit in a federal court by the trustee in a mortgage on the property given to secure bonds against such plaintiff and the defendants in the prior suit to protect the rights of the bondholders in the property.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1504–1509; Dec. Dig. ⊙══828.]

3. QUIETING TITLE ⊙══10—JURISDICTION—ABSENCE OF LEGAL REMEDY.

The trustee in a mortgage of real property given to secure bonds, who is not entitled to possession under the terms of the mortgage because there has been no default, and who cannot therefore maintain an action at law to protect his rights against adverse claimants in actual possession, and who are improving and selling to others parts of the property may maintain a suit in equity to cancel the deeds under which they hold as clouds on the title conveyed by the mortgage.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 36–42; Dec. Dig. ⊙══10.]

4. QUIETING TITLE ⊙══16—PERSONS ENTITLED TO CANCELLATION—MORTGAGE TRUSTEE.

Some six acres of land owned by a manufacturing company and adjoining its plant was unoccupied with the exception of an old house and one built for its superintendent. The old house was rented, and the tenant was allowed to build another small building with the right to remove it at the end of his tenancy. At that time, however, with the permission of the company he sold it to one of defendants, but did not sell any land. A subsequent tenant of the old house on leaving it did not surrender possession to the company, but his son, another defendant, through collusion with his codefendant at once moved in. Some two years afterward defendants obtained deeds to the entire six acres from heirs of a former owner, but who in fact had no title or interest in the property; the title of their ancestor having passed by an administrator's sale more than 50 years before. Defendants paid a nominal sum only for the deeds, but agreed to pay a further sum if they succeeded in acquiring title. Held, that their attempt to acquire title through adverse possession with color of title under the Alabama statute was collusive and fraudulent, and that the trustee in a mortgage of the property to secure bonds, which was then without right of possession but was bound as such trustee to protect the rights of the bondholders in the property,

was entitled to a decree canceling defendants' deeds and removing them from possession.

[Ed. Note.—For other cases, see Quieting Title, Cent. Dig. §§ 64, 65; Dec. Dig. ⊙⟞16.]

5. LANDLORD AND TENANT ⊙⟞66—ESTOPPEL OF TENANT—CLAIM OF ADVERSE POSSESSION.

Tenants at will cannot initiate a claim to adverse possession without first surrendering possession to their landlord.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 199–209; Dec. Dig. ⊙⟞66.]

6. EQUITY ⊙⟞39—JURISDICTION—RETENTION OF JURISDICTION ACQUIRED TO GRANT COMPLETE RELIEF.

Under the rule that a court of equity which has rightfully acquired jurisdiction of a cause will retain it to do complete justice between the parties, in a suit by a mortgage trustee for a cancellation of deeds as a cloud on the title to the mortgaged property, on a finding that the deeds are fraudulent and that defendants are wrongfully in possession, the court will not leave them in such possession, but will decree possession to complainant, although when the suit was commenced it did not have the right of possession under the terms of the mortgage.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–114; Dec. Dig. ⊙⟞39.]

In Equity. Suit by the Continental Trust Company against the Tallassee Falls Manufacturing Company, John R. Sayres, James D. Parks, and others. Decree for complainant.

The bill in this cause was brought by the Continental Trust Company, a Maryland corporation, as trustee, on March 18, 1911, under a deed of trust in mortgage form, executed to it by the Mt. Vernon-Woodberry Cotton Duck Company, a Delaware corporation, to secure an issue of $8,000,000 of bonds. John R. Sayres, James D. Parks, J. F. McCluskey, J. H. McBrayer, the Tallassee Falls Manufacturing Company, an Alabama corporation, and the Mt. Vernon-Woodberry Cotton Duck Company are made parties defendant to the bill. The deed of trust includes several manufacturing plants and lands situated in different states, and shares of stock in several corporations, and includes the lands and cotton factory of the Tallassee Falls Manufacturing Company, the Alabama corporation, situated near Tallassee, Ala., together with the capital stock of said corporation, which the mortgagor company then owned or might afterwards acquire. This mortgage and deed was executed August 30, 1899. On February 8, 1900, the Tallassee Falls Manufacturing Company executed a deed to the plaintiff herein confirmatory of the action of the mortgagor company in conveying said property (to which it did not then hold the legal title), and by which it conveyed said property to the plaintiff as trustee on the trust mentioned in said mortgage and then over to the Mt. Vernon-Woodberry Cotton Duck Company.

The deed of trust provided that the mortgagor company should preserve the corporate existence of the different corporations, whose stock or property was conveyed, together with all their corporate rights, and the mortgagor company covenanted that it would not suffer to be created any charge upon the property superior to the lien of the trust deed or mortgage.

By the terms of this mortgage or trust deed the trustee was not to have the right to the possession of this property conveyed unless default should be made in the payment of interest on or the principal of the bonds. At the time the bill was filed no such default had occurred.

The primary purpose of the bill is to conserve certain property belonging to the Tallassee Falls Manufacturing Company, at the time of the two conveyances mentioned, and of which it has since remained in possession in subordination to said conveyances, except as disturbed by the defendants Sayres and Parks, to the end that such property may continue to be security for

the mortgage debt and may be eventually applied to it in case of a default in its payment.

It is further alleged that the right and title of the plaintiff as trustee to this property is endangered by certain claims made in respect to the property by the defendants Sayres and Parks; that the Tallassee Falls Manufacturing Company heretofore instituted unsuccessful proceedings in the state chancery court in the effort to protect and conserve said property against the claims of Parks and Sayres; that since then neither the mortgagor company nor the Tallassee Falls Manufacturing Company had made any effort to protect the property against such claim; that the property so endangered forms a valuable portion of the mortgage security held by the plaintiff and will be lost to the plaintiff as trustee and finally to the bondholders, the cestui que trustent, unless the right of the trustee to it be protected.

The further allegations of the bill are substantially as follows: The Tallassee Falls Manufacturing Company owned and was in the possession of certain lands, between six and ten acres, on the east side of the Tallapoosa river, and between the river and the town of East Tallassee, where the operatives of that company's mills resided and which this company owned. Although this piece, six acres, or more, was in the heart of the company's holdings and immediately adjoining its plant, it had been, in part, allowed to remain unutilized for the reason that the company had reserved it as the place for contemplated improvements for the benefit of its operatives and the inhabitants of the towns of Tallassee and East Tallassee, such as a water basin of the waterworks, schoolhouses, and the like.

There was an old dwelling situated on this six acres, more or less, known as the Barent Du Bois house. On this same tract of land the company had constructed in the year 1900, at a cost of $3,500, a dwelling house for its assistant superintendent, Frank Milstead, and in which he resided for some years.

The cotton mill of the company was on the east side of the river and was operated by water power supplied by a dam across the river, and this dam was anchored on this vacant property here involved. One end of a steel bridge across the river rests on this property. A canal which conveys the water from the pool or pond, made by the dam across the river to the factory or power house of the company, was constructed across the land now in dispute. Through these agencies, the cotton mill on the east side of the river was operated. The plaintiff alleges that, if the title of the defendants Parks and Sayres be held valid, the damage to the plant of the Tallassee Falls Manufacturing Company would be great and irreparable, and that neither the Tallassee Falls Manufacturing Company nor the mortgagor company has any property in the state of Alabama, except that covered by the mortgage, of sufficient value to make good such loss.

During the year 1893, one Howard was put in possession, by the Tallassee Falls Manufacturing Company, of the above-mentioned Barent Du Bois house, situated on the land here involved, as its tenant. At the time this was done, the company was engaged in the construction of a dam across the river, and there were more laborers engaged in the work than could be housed by the company. Howard was granted permission, by the company, to erect a small house within a few feet of such dwelling which he occupied in which to board and lodge these laborers. He erected the small house and furnished lodgings to the laborers as long as he remained in possession. Afterwards, Howard vacated the premises and surrendered the dwelling house to the company, and A. J. Parks, the father of the defendant J. D. Parks, went into possession alone, either as the tenant of the company or with one of his sons (other than J. D. Parks) who became such tenant. By permission of the company, Howard sold the small house which he had erected as aforesaid to one Sayres, but did not convey or pretend to convey to him the land on which it stood. This house was a cheap affair costing about $50. On taking possession, Sayres began the operation of a small beef market in it. This market was a convenience to the employés of the company, and for that reason the company made no objection to Sayres' occupancy for that purpose. So far as the company knew or could reasonably infer, Sayres made no claim while

he was operating such market to the lands on which it was situated or any of the land involved in this controversy; his claim being confined to the house itself. Sayres bought this house about the year 1905, and not until two years after that date did the company receive any information that he was making any claim to any part of the land.

Sometime during 1907, Sayres began to add to the house. The company protested against his right to do so and demanded to know by what authority he was taking such action. It was then informed, for the first time, that Sayres had procured a deed from some one purporting to convey to him the land upon which the house, bought by Sayres from Howard, was situated. He declined to exhibit the deed or to give any information on the subject. In the early part of 1908, the company discovered the existence of the deed to Sayres. In September, 1908, the company discovered that a deed was recorded in the office of the judge of probate of Tallapoosa county (the proper place for the record of such conveyances) on October 30, 1907, and this deed was dated August 1, 1907, was executed by Elizabeth C. Du Bois, and purported to convey "one-fourth interest in all that portion of the north half of section 19 not disposed of in the lifetime of Barent Du Bois to T. M. Barnett, Sr., and Wm. Marks, lying east of the Tallapoosa river in Tallapoosa county." This deed covered the vacant property, six acres more or less, on the east bank of the river, including the land on which the dam and bridge were anchored, and the canal was dug, and on which the power house stood, and probably also the cotton mill of the company.

The Tallassee Falls Manufacturing Company later learned that Parks and Sayres were claiming title under two other deeds, not then recorded, but it never knew what persons had executed these two deeds or what land was included therein until in May, 1909, when Parks and Sayres filed an answer to a certain bill of complaint brought against them by the Tallassee Falls Manufacturing Company, and in which answer copies of said deeds were exhibited. These two deeds were executed by Mrs. Holden and Mrs. Minugh, each a granddaughter of Barent Du Bois, the original owner of the lands, and purported to convey their entire undivided interest in that part of the lands of Barent Du Bois situated in section 19, township 18, range 22, bounded on the west by the Tallapoosa river, on the north by the Tallassee Falls Manufacturing Company's lands, on the east by the Tallassee and Dadeville Road, and on the south by the G. W. Turnipseed lot, containing six acres more or less.

The bill avers that as A. J. Parks, the company's tenant, moved out of the dwelling house on the land in controversy, his son, J. D. Parks, by collusion between Sayres and his father, immediately moved into the dwelling house, never surrendering possession thereof to the Tallassee Falls Manufacturing Company nor giving them the opportunity to retake possession.

It is also alleged that Mrs. Holden, Mrs. Minugh, and Mrs. Du Bois, who executed the deeds to Parks and Sayres, had no interest whatever in the property, and that none of them had ever been in the possession of, that they had never paid any taxes on, and had never exercised any acts of ownership in respect to, it.

The prayer of the bill is sufficiently stated in the opinion.

On the same day the bill was filed, March 18, 1911, a restraining order was issued to all the defendants restraining them "from taking possession by inclosing or otherwise of any property claimed by them," the property in dispute, "except such as they or either of them have actually inclosed, and that they and each of them be restrained and enjoined from selling or from offering for sale or making other disposition, pending the hearing of this cause, of any part of said property." This injunction has been, and is still, in force.

The defendants Parks and Sayres, after the overruling of their demurrers by the court, answered the bill denying that any duty rested upon the complainant to conserve the property, and denied that the Tallassee Falls Manufacturing Company had any title to the property. The defendants admit being in possession of the land under claim of ownership, but deny that the Tallassee Falls Manufacturing Company was in possession when it executed the confirmatory deed of February 8, 1900, to the plaintiff, or that it had

been in possession since. They admit the construction of the canal, bridge, etc., but deny that any of these structures are on the property of which they, are in possession. They further admit the occupancy of Howard, but deny that he was a tenant of the Tallassee Falls Manufacturing Company, or that he obtained possession through them, or that he procured permission from that company to erect a small house on the land.

The defendants further admit that Howard vacated the premises in 1905, and that thereafter Sayres went into the possession of the house erected by Howard. They deny that Sayres conceived the idea of acquiring a fictitious title to the land, but they aver that by the deeds from Mrs. Elizabeth C. Du Bois, Mrs. Holden, and Mrs. Minugh they obtained title to the land on which the houses were located and to the adjoining land. They deny that Sayres took possession of the dwelling house by collusion with A. J. Parks, but aver that, after said Parks moved out, Sayres moved in.

The affirmative matter set up in the answer, by way of defense, is that the defendants acquired title to the property by the deeds mentioned, and that the Tallassee Falls Manufacturing Company had already instituted certain litigation in the state courts which they claim is an estoppel in the present suit. And further, as to their title, the defendants alleged that in 1850 or 1851 Mrs. Millie Du Bois, widow of the original entrant of the land, with her son, Barent Du Bois, Jr., and her daughter, afterwards Mrs. Smith, were in the possession of the lands described, and that they continued in the open, notorious, exclusive, and adverse possession, under claim of ownership, until about 1891. They aver that since that time Mrs. Millie Du Bois, her son, Barent Du Bois, Jr., and her daughter had died; that the daughter left two children, Alice V. and Grace Smith; that Alice V. married one Minugh, and Grace one Holden; that Barent Du Bois, Jr., left a son surviving him, Reed Du Bois, who "died four or five years ago," leaving as his only heir at law a widow, Mrs. Elizabeth C. Du Bois, and one child named Gladys. It was alleged that these persons were the only heirs at law of Millie Du Bois, Barent Du Bois, Jr., and of Mrs. Smith, and that they inherited and retained all the title and right that said parties owned to the lands. They (the defendants) then set up their deeds, and alleged that by virtue of the same they acquired title to the land and had been in possession ever since the execution of the deeds, and claim that, with the exception of whatever interest is owned therein by Gladys Du Bois, only child of Reed Du Bois, they are the owners of the property.

In the argument it was contended, as further matter of defense, that the Continental Trust Company, the plaintiff in this case, and the Mt. Vernon-Woodberry Cotton Duck Company, were foreign corporations, not qualified under the laws of Alabama to do business in the state, and for that reason, it was claimed, the mortgage and deed of trust from the Mt. Vernon-Woodberry Cotton Duck Company to the Continental Trust Company is inoperative and void in this state.

John M. Chilton and Benj. P. Crum, both of Montgomery, Ala., and H. N. Randolph, of Atlanta, Ga., for Continental Trust Co.
James W. Strother, of Dadeville, Ala., for defendants.

HENRY D. CLAYTON, District Judge (after stating the facts as above). The bill in this case is framed on the theory that the possession of the land by Parks and Sayres and under the deeds made to them by Mrs. Du Bois, Mrs. Holden, and Mrs. Minugh, constitute imminent waste of such land to the trust estate which was created by the mortgage and deed of trust from the Mt. Vernon-Woodberry Cotton Duck Company to the plaintiff, the Continental Trust Company, and that a court of equity ought to stay such waste.

Following appropriate allegations in the bill, the prayer is: (1) for injunction, pendente lite and perpetual, restraining said Parks and Sayres, and McBrayer and McCluskey (who claim certain lots under

deeds from Parks and Sayres), from selling or disposing of the six to ten acres of land, described in the bill, and the other part of section 19, township 18, range 22, in Tallapoosa county, Ala., which surveyor's subdivision is all the property involved in this controversy; (2) that the land claimed by Parks and Sayres be decreed to be a part of the trust estate conveyed to the plaintiff, as trustee, under the aforesaid mortgage and deed of trust; (3) that it be declared the duty of plaintiff to conserve and protect the trust estate for the benefit of the owners of the bonds issued under said mortgage and deed; (4) that the conveyances under which Parks and Sayres, and their privies, make claim to the land, or any part thereof, be delivered up and canceled: (5) that the plaintiff be put in possession of the land in dispute; and (6) that, "if mistaken in the special relief prayed, the plaintiff prays for such other, further, and different relief as the nature of its case may require and as to equity shall seem meet."

[1] The first objection raised by the defendants is that the plaintiff is not entitled to relief for the reason that at the time of the execution of the mortgage and deed by the Mt. Vernon-Woodberry Cotton Duck Company, a Delaware corporation, to the Continental Trust Company, a Maryland corporation, the plaintiff, and the subsequent ratification of it by the Tallassee Falls Manufacturing Company, the Alabama corporation, neither of these two foreign corporations had on file with the Secretary of State of Alabama an instrument of writing designating a place of business in this state and an authorized agent residing there, as required by the Alabama statute. Code of Alabama 1907, § 3642. This statute provides that:

"Every corporation not organized under the laws of this state shall, before engaging in or transacting any business in this state, file an instrument of writing, * * * designating at least one known place of business in this state and an authorized agent or agents residing thereat."

And section 3643 of the Code of Alabama stipulates that the filing of such instrument shall be with the Secretary of State.

The answer to this contention is apparent when the circumstances of this case are considered. It is not disputed that this mortgage and deed of trust was executed outside of the state of Alabama and at Baltimore, Md., by one of these foreign corporations to the other foreign corporation. Such execution having been outside of Alabama, clearly such action cannot be said to have constituted "engaging in or transacting any business in this state," Alabama. It needs no argument to show that such transaction does not come within the terms of the statute or within the legislative contemplation, and that therefore the statute is not applicable to this case. And, as to the deed of the Tallassee Falls Manufacturing Company, the Alabama corporation, to the Mt. Vernon-Woodberry Cotton Duck Company, the Delaware corporation, here the mortgagor, the transaction is an executed one; and it is well settled that the statute quoted has no application to executed contracts. Cranor v. Miller, 147 Ala. 268, 41 South. 678; Farrior v. N. E. Mort. Co., 88 Ala. 275, 7 South. 200; Kindred v. N. E. Mort. Co., 116 Ala. 192, 23 South. 56; Diefenbach v. Vaughan, 116 Ala. 150, 23 South. 88; Craddock v. Am. F. L. & M. Co., 88 Ala. 281, 7 South. 196.

[2] Another defense interposed is that the subject-matter of the controversy has been finally adjudicated in the Supreme Court of Alabama, and that this operates as an estoppel, barring this plaintiff from the prosecution of the present suit. It is manifest that this is not a sound proposition for the reason that the parties there and issues of law and fact determined by the state court, and the parties and issues of law and fact in the instant case, are so different that res adjudicata cannot be invoked here to defeat this plaintiff. The suit there was begun by bill in the state chancery court, filed by the Tallassee Falls Manufacturing Company, as complainant, now one of the defendants in this case. Neither the plaintiff nor the Mt. Vernon-Woodberry Cotton Duck Company was made a party to that cause. Moreover, not only were the parties in that cause different from these in this, but a different issue was presented and determined, as will appear from a reading of the bill and the opinion of the court in that case. Sayers et al. v. Tallassee F. M. Co., 167 Ala. 555, 52 South. 892.

There the controversy was determined upon the sole ground that the Tallassee Falls Manufacturing Company, which there claimed to have the legal title to the land, was out of the possession of it, and therefore, for that reason, could not maintain its bill to set aside the deeds held by Parks and Sayres as a cloud upon its title. The state court predicated its ruling upon this, and upon no other ground, and held that the remedy of that complainant was ejectment or other action at law, and consequently dismissed the bill for want of equity.

It is true that the plaintiff claims under the Tallassee Falls Manufacturing Company, but it is apparent that in the former case there was no adjudication on the merits of the controversy. In other words, that decision was merely to the effect that, so far as the Tallassee Falls Manufacturing Company was concerned, it, being out of possession of the land, could not assert its legal title and acquire possession of the land through the medium of a bill in chancery. That decision does not conclude this plaintiff, who had nothing to do with that suit, from now proceeding to have its rights and duties as trustee, under its mortgage and deed, determined and vindicated.

In the opinion of the Supreme Court of Alabama in the former case (167 Ala. 555, 52 South. 893) it is said:

"The gist of this bill, by appellee against appellants, is that the respondents claim certain lands and are in possession thereof, and that the complainant, on the other hand, claims to own, in fee, those lands, and desires by this bill to have its rights declared therein and to enforce its rights thereto. The remedy at law is plain, adequate, and complete, dependent in its selection upon the circumstances under which unlawful detainer or ejectment is appropriate. If the complainant is entitled to this property, to the exclusion of the respondents, that result can be readily obtained in one or the other forms of action. The complainant not being in possession, peaceable or otherwise, if those in possession are not still its tenants, the bill is without equity as an appeal to the remedy afforded by our statutes for the quieting of titles and claims to real estate, or as an effort to remove a specific cloud from its title." Citing Lyon v. Arndt, 142 Ala. 486, 38 South. 242, and other cases.

That opinion concludes:

"The decree appealed from is reversed, and a decree will be here entered dismissing the bill for want of equity."

And then the final decree itself ends as follows:

The decree of the chancery court is reversed and annulled, and this court, proceeding to render the decree which the chancery court should have rendered, doth order, adjudge, and decree that the bill of complainant be and is hereby dismissed for want of equity.

The law deduced from the decisions in adjudged cases and determinative of this defense, res adjudicata, here interposed, is that a judgment in a former suit will not be regarded res adjudicata unless there be in the former suit and in the subsequent suit: (1) Identity of the cause of action; (2) identity of the thing sued for; (3) identity of parties and the quality or capacity, for and against whom the claim is made; (4) the judgment in the former suit must have been upon the merits; and (5) upon an issue so directly in point as to control the issue in the subsequent suit. Of course, this last proposition (5) is subject to the qualification that in some cases the duty to have specifically raised the certain issue is so obvious, and the issue itself so necessarily involved, that the court will treat it as having been raised in the former suit.

The theory supporting the doctrine of res adjudicata is that matters, in their nature justiciable, which have once been investigated upon a distinct issue, and finally adjudicated by a court of competent jurisdiction, ought not again be the subject of litigation between the same parties or their privies; and the law in respect to this doctrine, estoppel by judgment, is well settled; but in some cases difficulty lies in the application of the law to the facts. A few of the decided cases will serve to give the correct exposition of the law and its proper application. Gilbreath v. Jones, 66 Ala. 129, 132; Mershon v. Williams, 63 N. J. Law, 398, 44 Atl. 211; New Orleans v. Citizens' Bank, 167 U. S. 371, 396, 17 Sup. Ct. 905, 42 L. Ed. 202; Mason v Mason, 5 Ala. App. 377, 59 South. 699; Montgomery Iron Works v. Roman, 147 Ala. 434, 41 South. 811; Grant v. Phœnix L. Ins. Co., 121 U. S. 105, 7 Sup. Ct. 841, 30 L. Ed. 905; Durant v. Essex Co., 74 U. S. (7 Wall.) 107, 19 L. Ed. 154; Gould v. E. & C. R. R. Co., 91 U. S. 526, 23 L. Ed. 416; Ryan v. Young, 147 Ala. 660, 41 South. 954; F. & D. Co. of Maryland v. Robertson, 136 Ala. 379, 34 South. 933.

[3] The parties to the bill in chancery in the state court are not the same parties to the case at bar. As it has been stated, the complainant there was the Tallassee Falls Manufacturing Company, suing while out of possession to cancel certain deeds as a cloud upon its title. Here the suit is by the mortgagee, the Continental Trust Company, not a party to the former suit and not entitled to possession at the time of the filing of the bill. The former suit did not determine the merits of the subject-matter, but determined only that the remedy of the complainant there was at law and not in equity. As to who really owned or had title to the land, it was not undertaken to be adjudged in that suit. Certainly the rights of this plaintiff were not so much as even suggested or in any way considered or determined.

In the opinion in McCall v. Jones, 72 Ala. 368, 371, Judge Somerville, for the court, said:

"The rule of res adjudicata * * * is confined to those cases where the parties to the two suits are the same, the· subject-matter the same, the identical point is directly in issue, and the judgment has been rendered in the first suit on that point. * * * It is not only essential that the issue, or point in question, must either have been actually decided, or necessarily involved in the first case, but the first judgment, sought to be pleaded in bar in the second suit, will not be available as a defense, unless it was a judgment on the merits of the case. McDonald v. Mobile Life Ins. Co., 65 Ala. 358; Freeman on Judgm. § 460; 1 Greenl. Ev. § 528; Hutchinson v. Dearing, 20 Ala. 798."

It is urged as further defense that inasmuch as the plaintiff, as trustee, has the legal title to the property, according to the allegations of the bill, and is out of the possession of the property itself, this bill cannot be sustained for the purpose of canceling the deeds held by Parks and Sayres and to protect the trust estate against the waste or trespass of these defendants.

It must be remembered that when this bill was filed the title of the plaintiff as trustee was not a ripened legal title that carried with it the present right to possession. This right to possession was inchoate and could not accrue until the law day of the mortgage—until there was default in the payment of interest on, or principal of; the bonds, for which payment the mortgage and deed was given to secure.

It is elementary to say that, if one be not in possession, he cannot sustain a bill to quiet title, for in such case his remedy is an action at law. The defendant insists that this generally recognized rule is applicable in this case, and that the plaintiff has a plain, adequate, and complete remedy at law. Of course, it is indisputable that when a party is in possession his remedy at law is inadequate, or, to be more accurate, he has no remedy there at all; for a suit at law must be brought against the party in possession, and the party who feels himself aggrieved, being in possession, cannot sue himself. If, however, he be out of possession, and there is no obstruction to his remedy at law, the rule would apply, and therefore he could not come into a court of equity.

The statute, section 267 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1163 [Comp. St. 1913, § 1244]), is no more than a legislative expression of pre-existing familiar law. As far back as Boyce v. Grundy, 3 Pet. 213, 7 L. Ed. 655, it was said, and it has been repeated in numerous cases since, including Williams v. Neely, 134 Fed. 10, 67 C. C. A. 171, 69 L. R. A. 232, that such statute is merely declaratory of the well-recognized rule that a suit in equity cannot be sustained where there is a plain, adequate, and complete remedy at law. The converse is equally the settled law; that is, if the plaintiff has a justiciable cause and he has no plain, adequate, and complete remedy at law, he must have one in equity. This plaintiff could not maintain an action at law, ejectment, or other similar statutory action, for the plaintiff did not have, at the time of the filing of the bill, the legal title coupled with the present right to possession.

In Cofer v. Schening, 98 Ala. 341, 13 South. 124, the law is stated:

"A plaintiff in ejectment, or in the corresponding statutory real action, cannot recover, unless at the commencement of the action he has a legal title, entitling him to the immediate possession."

In the case of Lewis v. Alston, 184 Ala. 339, 63 South. 1008, it is said that reversioners are not yet entitled to possession, and not being able to maintain an action at law are, for that reason, entitled to sue in equity to cancel a deed as a cloud on their title.

Of course, the courts have never undertaken to state all the instances where one out of possession can sustain a bill to quiet title. It would be impossible to do this, for the reason that each case must rest upon its own peculiar variety of facts and circumstances. The question presented in each instance is whether there is a remedy at law, and, if so, whether it is plain, adequate, and complete, in view of all the circumstances and as the merits of the particular case require. In other words, the test is that the remedy at law, in order to exclude equity jurisdiction, must be as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. Tyler v. Savage, 143 U. S. 95, 12 Sup. Ct. 340, 36 L. Ed. 82; Preston v. Sturgis, 183 Fed. 1, 105 C. C. A. 293, 32 L. R. A. (N. S.) 1020.

Judge Jones, my predecessor in office, in ruling upon the demurrers to the bill in this case, held correctly, I think, that the special equities alleged in the bill, if established by the evidence, were such as to show that the remedy at law, even if one existed, was not adequate and complete. Perhaps, it is well to say here, by way of parenthesis, that this ruling was made before equity rule No. 29 (198 Fed. xxvi, 115 C. C. A. xxvi), abolishing demurrers in equity cases, was adopted.

In Echols v. Hubbard, 90 Ala. 309, 7 South. 817, a case somewhat analogous in principle to this, it was held that a court of equity will take jurisdiction to remove a cloud upon the title to land, only when there is no remedy at law by which the superiority of apparently conflicting titles may be tried and determined, and this extends to cases where the complainant is in possession and also where, though he may be out of possession, he has only an equitable title which is not available at law.

And in the case of Freeman v. Brown, 96 Ala. 301, 303, 11 South. 249, it is said:

"The demurrers to the bill were properly overruled. On the case presented by complainant, he had no remedy in a court of law. The legal title was in the respondent through the foreclosure of a mortgage which antedated complainant's deed. The claim now advanced by complainant rests upon matter in pais which, he says, estops respondent to assert this legal title against his own superior equity. Of such claims no cognizance is taken by courts of law; equity alone can be invoked to their effectuation. 3 Brick. Dig. p. 448, §§ 26, 27. Ordinarily, a bill to remove clouds from title will not lie in behalf of one out of possession, for the reason that ordinarily under these circumstances an action for possession may be maintained at law, judgment in which would dissipate the alleged cloud. But where, as in this case, the title which is supposed to be clouded is an equitable one, the legal remedy does not exist, no recovery could be had at law, however meritorious plaintiff's title might be in the contemplation of a court of conscience, and upon this consideration the principle has become well established that chancery may be resorted to for relief against the cloud by one out of possession. Echols v. Hubbard, 90 Ala. 309 [7 South. 817]."

It should be borne in mind that it is alleged in the bill that the defendants Parks and Sayres had not only come into the possession of this piece of land, containing from six to ten acres, and were asserting title

thereto, but were from time to time making further aggressions upon the property covered by plaintiff's mortgage and deed, and embraced in the deeds under which Parks and Sayres claimed, and specifically that the deeds to Parks and Sayres (sought to be canceled) included the power house and other property necessary to the operation of the cotton mill, without which the entire value of these mills and other property would be lost to the plaintiff and its cestui que trust, or substantial and irreparable injury would result to the trust estate. It is also alleged that the defendants have sold lots, and were engaged in the effort to sell other lots to other purchasers, and that the purchasers in such cases had erected structures upon the lots, and that this kind of trespass would be repeated in the event other lots are sold; and, again, that all such lots sold and purposed to be sold are alleged to be a part of the property covered by plaintiff's mortgage and deed; and, further, that injunction was necessary to restrain the defendants from committing such trespass or waste. These allegations, in connection with the others in the bill, render this case proper for equity cognizance.

In addition to the ground mentioned, there is another reason why the plaintiff should have brought this bill and why it should be sustained. Under common-law principles, and especially in view of the provisions of the trust deed, it was the duty of the trustee, the plaintiff, to conserve and protect the estate for the benefit of the cestui que trust; the mortgagor having failed to protect it. In short, a failure to do this would subject the trustee to liability to the bondholders whose interests the trustee was in duty bound to protect.

In section 4 of article 2 of the mortgage and deed, it is provided, in part, as follows:

The mortgagor company will not voluntarily create or suffer to be created any lien or charge having priority to, or preference over, the lien of these presents upon the mortgaged premises, or any part thereof, or upon the income thereof, etc.

In section 5 of the same article the mortgagor is required to pay all taxes, assessments, and governmental charges lawfully imposed upon the premises, franchises, or property mortgaged, or any part thereof, or upon the incomes and profits thereof, the lien of which will be prior to the lien of such mortgage, "so that the priority of this indenture shall be fully preserved in respect to such property," etc.

In subsection 3 of section 7 of said article, it is further provided that:

The mortgagor company will at all times take such actions from time to time as may be necessary to preserve the corporate existence and rights of every company of whose capital stock the greater part shall be pledged or assigned hereunder.

Moreover, article 4 of said trust deed provides, amongst other things, for possession by the trustee and sequestration of the rents and profits of the mortgaged property by the trustee in case of a default in the payment of the interest on, or principal of, the bonds, and also for foreclosure sale of the property, etc.

In the case of Coosaw Mining Co. v. State of South Carolina, 144 U. S. 550, 12 Sup. Ct. 689, 36 L. Ed. 537, the bill was filed by the state to abate a public nuisance, and the question was whether a court of

equity would take jurisdiction of such a suit. In concluding the opinion, the court said:

"It is contended by the appellant that this case is not one of which a court of the United States, sitting in equity, could take cognizance. * * * But if it was not one of which the Circuit Court of the United States, sitting in equity, could properly take cognizance (Payne v. Hook, 7 Wall. 425–430 [19 L. Ed. 260]; Arrowsmith v. Gleason, 129 U. S. 86, 98 [9 Sup. Ct. 237, 32 L. Ed. 630]), the pleadings, upon the removal of the case from the state court, should have been reformed so as to make it a case to be tried at law. It is necessary therefore to inquire whether, according to the principles of equity, as recognized in the courts of the United States, the state can obtain relief by a suit in equity. The grounds of equity jurisdiction in such cases as the one before us are, substantially, those upon which courts of equity interfere, in cases of waste, public nuisance, and purpresture."

The court then cites the case of the United States v. Gear, 3 How. 120, 800, Appx., 11 L. Ed. 523, 838, where the United States brought ejectment but filed a bill in equity for an injunction to stay waste, and in commenting the court said:

"This court held, in the equity case, that digging ore from lead mines upon the public lands was such waste as entitled the United States to a writ of injunction to restrain it."

The case of Attorney General v. Richards, 2 Anstr. 603, is also cited. In that case an information in equity was filed to restrain the erection of wharves and docks in a certain harbor. In concluding its opinion in this case (Coosaw M. Co. v. South Carolina, supra), the court said:

"The Coosaw Mining Company, unless restrained, will not only appropriate to its use property held in trust for the public, but will prevent the proper administration of that trust, for an indefinite period, by obstructing others, acting under lawful authority, from enjoying rights in respect to that property derived from the state. These conflicting claims cannot be so effectively * * * settled by proceedings at law, as by a comprehensive decree covering all the matters in controversy. Proceedings at law or by indictment can only reach past or present wrongs done by appellant, and will not adequately protect the public interests in the future."

In that case the plaintiff stood in the attitude of a trustee, and as such invoked the aid of the equity court in the performance of a duty in the nature of an implied trust for all of its citizens. The case at bar is stronger than that, for here there is an express trust and it is the duty of the trustee to protect the estate; and, the established facts justifying, this duty should be made effective by this court.

The cestui que trust cannot rightfully complain for any depreciation to or waste of the estate, unless it be shown that the trustee is in default by failure or refusal to act in the protection of the trust estate.

In Royall's Adm'r v. McKenzie, 25 Ala. 363, where a bill was filed to charge the trustee for neglect of duty, it is said:

"No principle is better settled than that it is the duty of a trustee of a chose in action to take every necessary step, compatible with reasonable diligence, to meet the object of the trust (citing cases), and it is not sufficient for the trustee merely to apply for payment, but it is his duty to bring an action, if necessary, for the recovery of the amount."

And in the case of Blackburn et al. v. Fitzgerald, Adm'r, et al., 130 Ala. 584, 36 South. 586, the court held that before beneficiaries under a trust, and as such, could proceed by bill in equity for the enforce-

ment of equitable rights, they must first move the trustee to act, or show some sufficient reason for the failure to do so. See, also, Bailey v. Selden, 112 Ala. 594, 20 South. 854.

It cannot be doubted that it is the duty of the trustee to protect the trust estate against impairment, actual or imminent. If the remedy at law is adequate and complete, he must resort to law. If such remedy be not plain, he must come into a court of equity.

In Davis v. Wakelee, 156 U. S. 680, 688, 15 Sup. Ct. 555, 558 (39 L. Ed. 578), the court said:

"It is a settled principle of equity jurisprudence that, if the remedy at law be doubtful, a court of equity will not decline cognizance of the suit. * * * Where equity can give relief, plaintiff ought not to be compelled to speculate upon the chance of his obtaining relief at law."

On the facts of this case an action at law cannot be sustained by the plaintiff, the trustee, for it has not the right of immediate possession, although it has the legal title, because its right to the possession of the property of the trust estate is postponed until the law day of the mortgage and trust deed—until default in the payment of interest on, or principal of, the bonds. No such default had occurred when this bill was filed. Therefore, as a part of plaintiff's relief and necessary for its complete remedy, the injunction was proper to preserve the legal status or rights of the trustee and the cestui que trust.

All these considerations lead me to conclude that the plaintiff has no adequate or complete remedy, except in equity, on the issues presented by the pleadings, and that, although out of possession, it is entitled to all the relief prayed for, if the proof supports the averments of the bill.

[4] Turning now to the testimony, I find that one Howard entered into the old Du Bois house on a part of the six to ten acres of land, included in the land involved here, and built the small house while so occupying such premises and by permission of the Tallassee Falls Manufacturing Company, to whose title and interest the plaintiff has succeeded. There is no claim that Howard acquired his possession from any one other than the Tallassee Falls Manufacturing Company. Milstead was the assistant superintendent of the mills at the time, and as such he gave Howard permission to erect this small house which the defendant Sayres afterwards bought. This being so, it was tantamount to an admission, on the part of Howard, that his holding of the house or premises was as the tenant of the company. The company gave Howard permission to remove this small house from the premises within a reasonable time after the expiration of his tenancy. He did not, however, remove it, but at the expiration of his tenancy sold it to Sayres, who never did even so much as pretend to have purchased from Howard the land on which this small house was erected. Furthermore, the answer admits the purchase of the small house, but does not assert that Sayres acquired any right, by virtue of his purchase of the house, to any part of the land. He bought the house and no more, with the permission and understanding, implied at least, that he should have the right to remove it from the land.

It is set up in the answer that the defendants Parks and Sayres procured deeds to the land involved from Mrs. Elizabeth C. Du Bois, the granddaughter-in-law of Barent Du Bois, the original holder and entrant of the land, and from Mrs. Holden and Mrs. Minugh, each a granddaughter of the said Barent Du Bois, and that thereby they acquired paper title to the land. I have no doubt that Sayres, and Parks, who entered under Sayres, derived their possession through privity with Howard, who held the house by permission of the company from 1905, when Sayres bought the house, until said deeds were executed by Mrs. Du Bois, Mrs. Holden, and Mrs. Minugh on August 1, 1907, March 7, 1908, and January 16, 1908, respectively, to the defendants Parks and Sayres. During this two-year period, beginning in 1905, when Sayres bought the small house, until 1907, when said deeds were made, Sayres and Parks never claimed any interest in the land. If they did make any such claim, it was not known to this plaintiff, nor was such claim or assertion of ownership apparently hostile to the Tallassee Falls Manufacturing Company, certainly not open and notorious until the deeds had been acquired from Mrs. Du Bois, Mrs. Holden, and Mrs. Minugh some two years after they (Parks and Sayres) acquired the collusive possession. During that period their holding must have been under the company, which must be, at least, fairly implied from all the facts and circumstances. Finally, Parks and Sayres were the tenants at will of the company, and, as such, they did not acquire any title to any portion of the land because they never surrendered back possession of the land to the company and never acquired any new or other possession of the land except by collusion to defraud the company out of possession.

[5] The defendant Sayres, and Parks, who entered under Sayres, as stated, acquired possession if the small house which the company permitted Howard, as its tenant, to erect and sell, as tenants of Howard, and, in privity with the company, they are not in position to question the title of the company to the property. The defendants Parks and Sayres, being tenants at will of the company of the small house, as such could not acquire any title whatever to any portion of the land without first surrendering back possession of the land to the company. The compelling duty of such prior surrender is well stated in Littleton v. Clayton, 77 Ala. 571, 576, where a tenant moved off the premises, but, before the landlord had opportunity to retake possession, returned and endeavored to set up an adverse title, acquired during the tenancy. The court said:

"No rule of law is more generally settled than that a tenant, while he is in possession, cannot dispute the title of his landlord, nor set up a superior title in himself or a stranger, to defeat an action by the landlord to regain possession. The tenant, by renting and receiving possession from the landlord, recognizes his title, and is precluded from showing that he had no title at the time of the renting. If the tenant desires to assert title in himself or another, he must surrender possession of the premises, and give his landlord the advantage of possession in any litigation as to the title."

And this rule applies where possession is acquired by collusion with the tenant, as the testimony clearly shows was done in this case by the defendants Parks and Sayres.

The same is true of the possession acquired by Sayres of the old Du Bois dwelling house on the property. The testimony shows that A. J. Parks, the father of the defendant J. D. Parks, was in possession of this dwelling, either as a tenant of the company, or by an entry under Howard, who was the tenant of the company. It is not claimed that A. J. Parks acquired possession from any one other than the company, nor is any right or title alleged to have been in A. J. Parks, except as it might have been derived from the company in the manner above stated.

The testimony further shows that as A. J. Parks, the tenant, moved out of the dwelling house, the same wagons that carried his household effects away also carried in the household effects of Sayres —that the abandonment of the possession of the dwelling house by A. J. Parks and the beginning of the occupancy of it by Sayres was practically a simultaneous transaction. There was no appreciable interval between such moving out and such moving in—no hiatus in which the company could have retaken possession of the dwelling house.

Furthermore, the testimony does not show that the defendants Parks and Sayres ever paid Mrs. Elizabeth Du Bois anything, and, even if they had paid her a consideration for her deed, she had no title to the land, was not in possession, and therefore could not convey any title. As to the deeds from Mrs. Holden and Mrs. Minugh, the testimony shows, and it is a pregnant fact, that no consideration passed for such papers other than one dollar paid in each case and also a promise to pay the grantors, each or both, it is not clear, $1,000 if the defendants Parks and Sayres should succeed in holding the property here involved and described in such deeds.

As a part of the fraudulent plan of Parks and Sayres to acquire possession of the property, it seems reasonable to infer that their purpose was, after having first acquired possession in the manner stated, to obtain paper title, assert a bona fide possession adverse to the company, and then hold possession, under such papers as color of title, until such holding would ripen into a defensible title under the Alabama statute.

Section 2830, Code of Alabama 1907, provides:

"Adverse possession cannot confer or defeat title to land unless the party setting it up shall show that a deed or other color of title purporting to convey title to him has been duly recorded in the office of the judge of probate of the county in which the land lies for ten years before the commencement of the action. * * *"

The conduct of the parties was a wrong against the company. And the deeds relied upon by the defendants as their paper title were procured as a part of their scheme invented to defraud the company out of its property.

To defeat this fraudulent purpose and protect the interest of its cestui que trust, the plaintiff, by this bill, has properly invoked the equity jurisdiction of this court.

In addition to what has been said, the law applied to the facts of this case satisfy me that the defendants are estopped from denying the title of the Tallassee Falls Manufacturing Company and the right

and title of the plaintiff derived from that source. If, however, there is in fact any break in the chain of title of the Tallassee Falls Manufacturing Company, the testimony convinces me that such break relates to only a small fractional portion of the land, and that it cannot be of any benefit to the defendants in this cause.

It appears that Mrs. Millie Du Bois, under whom the defendants now claim title, occupied for many years the Barent Du Bois dwelling on the vacant property hereinbefore referred to as a part of the six to ten acres of land, a part of section 19, township 18, range 22, in Tallapoosa county, Ala., the subject-matter of this controversy. A careful consideration of the testimony of all the witnesses, together with the circumstances, leads me to the conclusion that the weight of the testimony shows that her occupancy was not adverse to the holders of the legal title.

It is ascertained that the land involved was sold in 1852 by McKenzie, as administrator of Barent Du Bois, who acquired them by entry from the United States. In the petition filed in the probate court of Tallapoosa county in 1850, the widow, Mrs. Millie Du Bois, and the children of Barent Du Bois, were made parties defendant, and under these proceedings the land was sold for division among those interested. It is a fair presumption that the proceeds were divided and that the widow received her proper share, or, at least, that her dower right was sold. But as to this we are not compelled to resort to conjecture, for the testimony shows that on May 19, 1851, Millie Du Bois, widow and relict of Barent Du Bois, deceased, who had at a former term of the probate court of Tallapoosa county, Ala., filed her relinquishment of dower in the real estate of the said Barent Du Bois, deceased, claimed her dower interest in the money arising from the sale of the lands of Barent Du Bois, deceased. In the same judgment entry of the probate court, from which this fact is ascertained, that statement is followed with this:

"And it appearing to the satisfaction of the court that the report of the sales of said lands by the administrator has been returned into court; and it also appearing from due proof made that the sum of one thousand and five hundred dollars is a fair equivalent for the dower interest of the said Millie Du Bois, widow of Barent Du Bois, as aforesaid: It is therefore ordered, adjudged and decreed that the sum of one thousand and five hundred dollars be, and the same is hereby allowed to the said Millie Du Bois, out of the purchase money arising from the sale of the real estate belonging to the estate of said decedent. It is further ordered, adjudged and decreed by the court, that John McKenzie, administrator of said deceased, pay the amount so adjudged to the said Millie Du Bois, widow as aforesaid within a reasonable time after the said purchase money arising from the sale of said real estate as aforesaid shall become due and payable."

See the following judgment entries by the probate court of Tallapoosa: On Petition to Sell Lands, made December 3, 1850; Relinquishment of Dower by Millie Du Bois, dated January 11, 1851; Order of Sale of Lands of Barent Du Bois, deceased, dated January 13, 1851; Order Approving Sale of Lands and Directing Conveyances executed to Purchasers, entered April 21, 1851; Order Allowing Dower out of Proceeds of Sale of Lands, made May 19, 1851.

In addition to these facts, the testimony shows that the land was

.purchased at the sale, had under such proceedings by one Neal, and that he afterwards, during his lifetime, conveyed a part of the lands, and after his death his administrator conveyed the other part, and the Tallassee Falls Manufacturing Company claims under title from the parties who derived their title from that source, and as follows:

In 1878, the title of Gilmer and Jordan to a one-sixth interest each was vested in the Tallassee Falls Manufacturing Company No. 1, the corporation that erected the cotton factory on the west bank of the Tallapoosa river and whose property was afterwards sold under foreclosure proceedings in the chancery court of Montgomery county. At this sale one Chase became the purchaser of one of such interests, and one McKissick of the other, and afterwards both of these interests were acquired by the Tallassee Falls Manufacturing Company as well as all the other interests coming down from Barent Du Bois through subsequent or derivative purchasers.

Properly authenticated copies of the deeds and other papers constituting the chain of paper title of the Tallassee Falls Manufacturing Company were introduced in evidence. The original of such muniments of title were some years ago put in possession of the Mt. Vernon-Woodberry Cotton Duck Company, the mortgagor, at Baltimore, Md., where its principal office was located; and it is reasonably established that these papers were destroyed by the great fire which afterwards occurred in that city.

Predicate was properly laid for the introduction in evidence of the transcripts of title from the records in the office of the judge of probate of Tallapoosa county, Ala., and these records go to sustain the title of the Tallassee Falls Manufacturing Company.

As stated, Mrs. Millie Du Bois had no title to any of this land. The title that her husband had was divested by the proceedings had in the probate court of Tallapoosa county, Ala. When she left the property in May, 1891, she never returned to it; nor did her heirs ever assert any right to the possession of it. The testimony convinces me that she understood her right to the possession of the property, or any part of it, was terminated when she removed from Alabama to the Indian Territory in 1890. It is a significant fact that immediately upon Mrs. Du Bois vacating the property the Tallassee Falls Manufacturing Company made extensive repairs to the house; and the facts attendant upon the making of such repairs are more than persuasive that the Tallassee Falls Manufacturing Company thus asserted possession and ownership of the house and premises, and that during the years intervening from 1890 to 1907 neither Mrs. Du Bois or any of the Du Bois heirs disputed in any way this assertion of ownership and possession.

Again, it must be remembered that when the lands were sold for division Mrs. Millie Du Bois was a party to the sale, the regularity of which has never in any way been questioned. It is reasonable to assume that, inasmuch as her dower right had been sold, she was in possession of the house by permission of the holders of the legal title to the land. I am convinced that this was the character of her holding.

It is true that she may have done acts while in possession consistent with the assertion of adverse title, but the same acts are consistent with a holding not adverse to the Tallassee Falls Manufacturing Company. It is certain that the testimony does not show that she claimed continuous ownership of the land after she left it. A title derived by adverse possession, under the circumstances, would be incompatible with the prior proceedings in the probate court, to which she was a party, and by which whatever title or right she had as widow had been divested out of her and invested in the party who acquired title under such probate court proceedings.

It is also made to appear from the testimony that Mrs. Holden and Mrs. Minugh were out of the possession of the property—indeed, it is not established that they were ever in possession—and it is clear that they had been out of possession for more than ten years when they executed the deeds. The testimony does not connect them in any way with the possession of their mother. It is my opinion that, under the deeds executed by them, the defendants Parks and Sayres, acquired nothing, except that such papers might become color of title in connection with adverse possession which they (Parks and Sayres) might thereafter set up as defensible title under the Alabama statute above quoted.

Mrs. Elizabeth Du Bois, who executed the deed on August 1, 1907, to the defendants Parks and Sayres, is a granddaughter-in-law of Barent Du Bois, the original owner, who, as stated, derived title from the United States. If it be true that Mrs. Barent (Millie) Du Bois, as claimed by the defendants, acquired title by adverse possession, the deed from Mrs. Elizabeth Du Bois, the granddaughter-in-law, would not have conveyed to the defendants Parks and Sayres any interest in the property. And, as to Mrs. Holden and Mrs. Minugh, they were granddaughters of Mr. and Mrs. Barent Du Bois, and would have had a possible interest if the title had ever been vested in Mrs. Barent (Millie) Du Bois, provided they had ever been in possession of the property, either themselves or by tenants. Undoubtedly they could not sell and convey while out of possession of the premises. Neither of them had ever been in possession—certainly not from the time Mrs. Millie Du Bois removed from Alabama to the Indian Territory in 1890, 18 years before the deeds were executed to Parks and Sayres.

Parks and Sayres were bound to know, because they went into possession under the company, as above stated, that the Tallassee Falls Manufacturing Company was claiming adversely to all these parties, and all the circumstances show that in taking the deeds to themselves they acted with reference to that fact. The parties to the transaction all knew that the pretended vendors were selling, and the pretended purchasers were buying, nothing but a lawsuit. The testimony shows that Parks and Sayres contributed only a half a dollar each of the cash payment under the deeds from each of these vendors, and that the contract, made as a part of the consideration of the deeds, provided that Parks and Sayres should pay Mrs. Holden and Mrs. Minugh a thousand dollars—to them jointly or to each of them is not clear—

provided that Parks and Sayres should 'succeed in their efforts to hold the property. As no one else, except the Tallassee Falls Manufacturing Company, was making any claim, this provisional agreement undoubtedly had reference to the claim of that company. Such an attempted purchase was violative of public policy. Sharp v. Robertson, 76 Ala. 343.

I conclude that Parks and Sayres bought this land when it was adversely held; that they bought either with the intention of forcing a compromise with the company, or of eventually setting up that their adverse possession was in good faith and under color of title, and this, manifestly for the purpose thereby, through such adverse possession for ten years, of acquiring under the Alabama law a defensible title available in probable litigation with the company. In other words, the possession of Parks and Sayres having been obtained by fraud and collusion, and the deeds which they took to the land having been procured in further pursuance of their preconceived design to defraud the Tallassee Falls Manufacturing Company, these deeds were nothing more than a pretense of paper title, but, if allowed to remain unchallenged, would operate wrongfully to deprive this plaintiff of a valuable part of the trust estate which it holds for the benefit of others.

[6] As a part of the relief sought by the bill, it is prayed that the deeds to Parks and Sayres be canceled and that the trustee be put in possession of the property. There is no doubt that the deeds can be canceled, but can this court now put the trustee in possession? To answer this in the affirmative would not, it is contended by the defendants, be consistent with the theory that the trustee was not entitled to possession under the mortgage, at the time of the filing of the bill, as there had been no default in the payment of interest on, or principal of, the bonds secured by the mortgage. But, as it has been stated, the mortgagee who brought this bill before default of the mortgagor, not having the right to the present possession of the property and in protecting the trust estate, was not afforded an adequate and complete remedy at law. This part of the prayer, that the court put the trustee, the Continental Trust Company, not the Tallassee Falls Manufacturing Company, into possession, is not the same thing as asserting the right to such possession independent of action by this court. This, in my opinion, answers the suggestion made by the defendants.

Of course, it is a familiar principle that, when a court of equity once acquires jurisdiction of a particular · subject-matter and over particular parties, it will not determine the case by piecemeal, but will settle the whole controversy and will not remit the parties to any other forum for any part of their appropriate relief.

Having determined the issues in favor of the plaintiff, and having directed the delivery up and cancellation of the deeds to Parks and Sayres, this court ought not to leave Parks and Sayres in possession, which possession is wrongful and in fraud of the rights and equities of the plaintiff and its cestui que trust. Parks and Sayres must be put out of possession, and somebody must hold the property for the

benefit of the rightful owners and beneficiaries. Undoubtedly somebody has the right to such possession, and the property must be held and kept for somebody's benefit. This right of possession cannot be left, like Mahomet's coffin, suspended between the floor and the ceiling, or, unlike that coffin, suspended elsewhere.

The court is of opinion, under all the facts and circumstances, that the plaintiff ought to have this possession in order to preserve the property for the payment of the interest on and principal of the bonds provided for in the deed of trust from the Mt. Vernon-Woodberry Cotton Duck Company to the Continental Trust Company. The principle that equity will settle the entire controversy, even though it involves, in part, a pure question of law, is thoroughly settled in Va. & Ala. Mining & Mfg. Co. v. Hale & Co., 93 Ala. 542, 545, 9 South. 256, 257. In that case the court said:

"The general rule is that, when equitable jurisdiction attaches for a rightful purpose, the court will retain it, and proceed to settle and adjudicate all the matters in controversy, granting complete relief, though it may involve the adjudication of purely legal questions."

In cases of foreclosure, the chancery court has frequently decreed that after foreclosure by sale it has the power to put the purchaser in possession, if withheld by the defendant, or any person who has come into possession pendente lite, or who is a mere trespasser, having no legal title to the property. Thompson v. Campbell, 57 Ala. 183; Creighton v. Paine, 2 Ala. 158; Wiley v. Carlisle, 93 Ala. 237, 9 South. 288. This much is necessary to put an end the litigation.

It is said that the better practice is that the order for the surrender of possession should be made before the issue of the writ. Here there is to be no sale and no subsequent proceedings, and it is entirely proper that the decree direct the defendants, on demand of the plaintiff, to deliver up possession. If they fail to do so, then the plaintiff can ask for a writ of assistance.

When the defendants surrender possession of the property, they do no more than they should have done before the suit was commenced. The proof shows that the Tallassee Falls Manufacturing Company objected to the additions to the house, and have from the very beginning and all along objected to the defendants' occupancy, and even shortly after they (Parks and Sayres) acquired their deeds.

The observation may be indulged that, in every lawsuit where the plaintiff is successful, some hardship, more or less, is imposed upon the unsuccessful defendant. But here none seems to be visited upon these defendants Parks and Sayres. They simply engaged in the venture of setting up a claim to the property, based upon possession acquired by collusion and a worthless paper title for which they paid nothing or practically nothing. They bought a chance, they "took a long shot," and ought to lose. In my opinion this is the proper case and this is the proper time for a court of equity to declare that they have lost.

It follows, from what has been said, that it is the duty of the Continental Trust Company to protect the estate of its cestui que trust against loss or waste; that the injunction, heretofore issued, will be

made perpetual; and that the deeds to Parks and Sayres, described in the bill, and also the deeds from Parks and Sayres to McBrayer and McCluskey, be delivered up and canceled; and that the possession of the land involved be surrendered by Parks and Sayres, and those claiming under them, to the plaintiff; and that, if such surrender is not made, then a writ of assistance can be issued.

A decree in harmony with this opinion will be entered.